IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| The Bishop of Charleston, *a corporation sole, and* the Bishop of the Diocese of Charleston, *in his official capacity*,<br><br>Plaintiffs,<br><br>v.<br><br>Century Indemnity Company,<br><br>Defendant. | Civil Action No. 2:14-1289-RMG<br><br><br><br><br><br>**ORDER** |

This matter is before the Court on Defendant Century Indemnity Company's ("Century") motion for partial summary judgment as to loss of consortium claims (Dkt. No. 69), motion for partial summary judgment as to all class action and certain individual claims (Dkt. No. 72), motion for partial summary judgment as to pre-May 6, 1965 claims (Dkt. No. 73), and motion to exclude the testimony of William Hager (Dkt. No. 74). For the reasons set forth below, the Court grants the motion for partial summary judgment as to loss of consortium claims, denies the motion for partial summary judgment as to all class action and certain individual claims, grants in part the motion for partial summary judgment as to pre-May 6, 1965 claims, and denies the motion to exclude the testimony of William Hager.

I.  **Background**

Plaintiffs the Bishop of Charleston as a corporation sole and the Bishop of the Diocese of Charleston in his official capacity (together, the "Diocese") seek reimbursement from Century for $11.5 million paid to settle claims arising from sexual abuse of minors by the Diocese's clergy. The abuse at issue occurred over the approximate period 1943 to 1986. (Am. Compl. Ex. 1, Dkt.

No. 1-1 at 18–22.) The settlements of claims arising from that abuse occurred between 1994[1] and the present, including a multimillion-dollar settlement of three class actions (which also settled three individual actions), executed on January 12, 2007. (*Id.*; Settlement and Arbitration Agreement, Dkt. No. 71-1.)

The parties agree that Century's predecessor-in-interest, Insurance Company of North America,[2] issued the Diocese occurrence-based insurance policies covering the periods May 6, 1965 to May 6, 1968 (policy CP2831), May 6, 1968 to May 6, 1971 (policy CP10065), and May 6, 1971 to May 6, 1979 (policy CP044874). (Am. Compl. ¶ 5, Dkt. No. 1-1 at 15; Answer ¶ 5, Apr. 14, 2014, Dkt. No. 4 at 1–2.) The Diocese alleges that an additional policy, CGL132981, covered the period May 6, 1962 to May 6, 1965. (Am. Compl. ¶ 5, Dkt. No. 1-1 at 15.) Century denies the existence of CGL132981. (Answer ¶ 5, Dkt. No. 4 at 1–2.) There is no claim of coverage before May 6, 1962.

The Diocese was first notified of the sexual abuse claims relevant to this action in 1989.[3] The Diocese argues that those claims were "promptly reported" to its insurer, Century, "who over

---

[1] The Diocese asserts that the settlements at issue in this action occurred from 1995 (Dkt. No. 84 at 2), but Exhibit 1 to the amended complaint shows claims settled in 1994, *e.g.*, John Roe 140.

[2] For simplicity, this Order uses "Century" to refer to both Century Insurance Company and Century Insurance Company's predecessors-in-interest.

[3] The Diocese asserts "[c]laims against the Diocese for sexual abuse of minors by priest [*sic*] were first made at the end of 1994" (Dkt. No. 84 at 3), but Exhibit 1 to the amended complaint shows notice of the claim of John Roe 147, regarding abuse from 1959 to 1961, in 1989. That claim was settled in 1998 for $425,000, including settlement of John Roe 147's claims regarding abuse from 1962 to 1962, which the Diocese received notice of in 1993. (Dkt. No. 1-1 at 18–22.) Exhibit A to the Diocese's interrogatory responses, however, provides that the Diocese received notice of all claims of John Roe 147 in 1990, that those claims had a "date of claim" of November 1997, that they were settled in February 1998, and that the insurer was advised of the claim on April 8, 1998. (Dkt. No. 94-1 at 27.) "Date of claim" in the interrogatory responses might be taken to mean when a lawsuit asserting the claim was filed, but Century, citing those same responses, represents that John Roe 147's claims "were not the subject of a lawsuit." (Dkt. No. 72-1.)

the next 6 years responded with a pattern of delay, avoidance, and denial of the claims." (Dkt. No. 84 at 3.) Century denies that, and argues that the Diocese's failure to provide notice of claims before settlement vitiates coverage for those claims. (Answer ¶¶ 6–8, Dkt. No. 4 at 2; Dkt. No. 72-1 at 13–15.) The Diocese also alleges that Century "routinely denied requests for settlement authority" and refused to participate in settlement discussions, which "evolved into a practice where the Diocese undertook to negotiate and settle the claims and then seek reimbursement without prejudice to having settled without consent"—a practice to which the Diocese claims Century agreed. (Dkt. No. 84 at 6–8; *see, e.g.*, James C. Geoly Letter to Cody Smith, Dec. 19, 1997, Dkt. No. 71-14.) Finally, the Diocese argues that Century directed the Diocese to litigate charitable immunity and statute of limitations defenses, a strategy that the Diocese believes would have exposed it to excess judgments. (Dkt. No. 84 at 7.) However, the judge who approved the class action settlement, the Honorable Diane S. Goodstein, described those as "significant legal defenses" that might bar class members' claims. (Order Approving Settlement, July 30, 2007, Dkt. No. 71-2 at 14.)

The Diocese's interrogatory responses show that it first notified Century of some claims "pre-April 1995." (Pls.' Answer Def.'s Interrogs. Ex. A, Dkt. No. 94-1.) Century was notified of those claims before they settled. (*Id.*) On April 8, 1998 and again on February 20, 2000, the Diocese notified Century of certain other, already-settled claims. (*Id.*) The Diocese then concluded that "it was a waste of time to seek prior approval" from Century (Dkt. No. 84 at 8), and so it did not again provide Century with notice of any claims until June 17, 2011, when it notified Century both of certain other, already-settled individual claims and of the class action

settlement executed almost three and a half years earlier (Pls.' Answer Def.'s Interrogs. Ex. A, Dkt. No. 94-1).[4]

The Diocese filed this action in the Charleston County Court of Common Pleas on February 27, 2014, and amended the complaint on March 27, 2014 (Dkt. No. 1-1.) Attached to the amended complaint as Exhibit 1 is a spreadsheet detailing "Pre-1970 Sexual Abuse Claims." (Dkt. No. 1-1 at 18–22.) Century, asserting diversity jurisdiction, removed to this Court on April 4, 2014 (Dkt. No. 1) and answered the complaint on April 14, 2014 (Dkt. No. 4). On November 5, 2014, the Court denied as untimely Century's motion to amend its answer to assert a statute of limitations defense six weeks after the deadline for amending pleadings. Century asserted that it mistakenly understood the Diocese to be seeking indemnification only for the 2007 class action settlement and not for earlier any settlements. The Court denied that motion, noting that Century's argument contradicted the fact that its answer referenced Exhibit 1 to the amended complaint, which details many pre-2007 settlements. (Dkt. No. 21 at 4.)

Discovery is now complete and this action is scheduled for a bench trial commencing October 24, 2016. Before the Court are Century's three motions for partial summary judgment. Century seeks summary judgment as to loss of consortium claims (Dkt. No. 69), arguing that there was no liability for filial consortium claims and that no consortium claims were within the scope of coverage. Century seeks summary judgment as to all class action and certain individual claims (Dkt. No. 72), arguing that the Diocese failed to notify Century of those claims. Century seeks summary judgment as to pre-May 6, 1965 claims (Dkt. No. 73), arguing that no coverage existed before May 6, 1965. Also before the Court is Century's motion to exclude the testimony of

---

[4] These notice dates are found in Exhibit A to the Diocese's interrogatory responses. The Diocese and Century engaged in considerable correspondence regarding claims, in which the Diocese may have provided notice to Century at times other than those described here.

William Hager (Dkt. No. 74), filed before the parties agreed to a bench trial. The Diocese identified Mr. Hager, formerly Commissioner of Insurance of the State of Iowa, as an expert in insurance industry practices.

## II. Legal Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### III. Discussion

#### A. Motion for Partial Summary Judgment as to Loss of Consortium

Century moves for summary judgment as to the Diocese's claims for indemnification of its settlements of loss of consortium claims. Two types of consortium claims were settled: filial loss of consortium claims brought by abuse victims' parents, and spousal consortium claims brought by abuse victim's spouses. The Court grants Century's motion for summary judgment as to both types of consortium claims because it finds that the Diocese had no legal obligation to pay those claims. Filial consortium is unrecognized by South Carolina law, and spousal consortium is unavailable where the underlying injury occurred entirely before marriage.

##### 1. Filial Consortium

The policies issued to the Diocese provide coverage for claims that the Diocese is "legally obligated to pay as damages." (*See, e.g.*, Dkt. No. 7-2 at 7.) Century asserts that this language means that it is liable to indemnify only obligations enforceable by law. (Dkt. No. 69-1 at 9–10 (citing *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455, 457–59 (S.C. 2004).) Century argues that because "'South Carolina law does not recognize claims for loss of filial consortium,'" it cannot be liable to indemnify the Diocese's decision to pay such claims nonetheless. (*Id.* (quoting *Doe v. Greenville Cty. Sch. Dist.*, 651 S.E.2d 305, 307–08 (S.C. 2007).) Century accordingly asks for summary judgment as to the Diocese's claims for indemnification for filial consortium claims. The Diocese responds that when these claims were settled, South Carolina law had not firmly established the unavailability of filial consortium, pointing out that the *Doe* decision that Century quotes was not rendered until August 2007—a month after final approval of the class settlement that accounts for the great majority of settled consortium claims.

The Court agrees that Century is not liable for indemnification of claims that the Diocese was not liable to pay. In the South Carolina case Century cites, *Helena Chemical*, the South

-6-

Carolina Supreme Court held that insurer liability for amounts that the insured is "legally obligated to pay as damages" extends to equitable remedies, *i.e.*, the cost of an injunction requiring environmental cleanup of a contaminated site. 594 S.E.2d at 457–58. The relevance of that holding to this case is opaque. But the South Carolina Supreme Court has held that an insurer is obligated to defend its insured only "[i]f the underlying complaint creates a possibility of coverage under an insurance policy." *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 578 (2009). Under South Carolina law, an insurer is not obligated to defend allegations that fail to state a cognizable claim for relief. It follows logically that there is no obligation to indemnify the settlement of allegations that failed to state a cognizable claim for relief.

The Court also agrees that South Carolina law does not permit filial consortium claims. The Diocese fails to raise any genuine dispute regarding the availability of filial consortium in South Carolina at any relevant time. The August 2007 *Doe* decision the Diocese refers to was the South Carolina Supreme Court's affirmance of a trial court's dismissal of, *inter alia*, filial consortium claims. 651 S.E.2d at 308–09. The *Doe* decision did not change South Carolina's long-standing non-recognition of filial consortium claims. When overruling consortium class members' objections to the class settlement agreement at issue in this case, Judge Goodstein cited South Carolina Supreme Court cases dating from 1967 in concluding that

> . . . there has been no change in the law as it was at that time: As the South Carolina Supreme Court has made clear, a child is the only party who may bring a loss of consortium claim under S.C. Code § 15-75-20. The law simply does not recognize a right of action of a parent to recover for the loss of consortium of a child.

(Dkt. No. 71-2 at 11 (internal quotation marks and citations omitted).) The Diocese was told that South Carolina did not recognize filial consortium claims by the judge who approved the settlement of filial consortium claims against the Diocese. This Court understands that the Diocese

may have had good reason nonetheless to settle those claims (for relatively small amounts), but Century is not liable to indemnify claims that the Diocese was not liable to pay.

### 2. Spousal Consortium

The Court finds that the Diocese also had no liability to pay spousal consortium claims that purportedly arose before marriage. "Loss of consortium arises out of the special relationship between a husband and wife." *Stewart v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 597, 604 (S.C. Ct. App. 2000). Loss of consortium claims are unavailable where the underlying injury occurred prior to marriage. *See Rockstroh v. A.H. Robins Co.*, 602 F. Supp. 1259, 1269 (D. Md. 1985) ("It appears to be universally held that, in order to maintain a valid action for loss of consortium, the parties must be married at the time of the injury."); Paul Davis Fancher, *To Have and Not Hold: Applying the Discovery Rule to Loss of Consortium Claims Stemming from Premarital, Latent Injuries*, 53 Vand. L. Rev. 685, 694 ("A marital relationship between the parties at the time of injury has therefore become a universal requirement for a loss of consortium claim."). A minority position allows an exception for latent injuries undiscoverable before marriage. *See, e.g., Friedman v. Klazmer*, 718 A.2d 1238, 1241 (N.J. Super. Ct. Law. Div. 1998) (providing, as an equitable exception to "the rule that a party must be married before an injury in order to recover loss of consortium damages," that "a spouse may proceed with a loss of consortium claim where the injury was suffered before marriage, so long as the injury was not discovered or reasonably discoverable by either spouse until after the marriage").[5] Courts, however, have refused to extend

---

[5] There are also cases discussing cohabitating domestic partners as a possible exception to the rule that marriage before injury is a prerequisite for consortium claims, *see, e.g., One Weaver v. G.D. Searle & Co.*, 558 F. Supp. 720, 721–24 (N.D. Ala. 1983) (surveying state laws), but that exception has no relevance in the present case.

-8-

that minority view to repressed memories of sexual abuse that occurred before marriage. As the Supreme Court of Iowa explained in a repressed-memory sexual abuse case,

> The discovery rule anticipates that the claimant had a valid cause of action within the period of limitations, but for some reason, was unaware of it. Here, because there was no marital relation between [the parties], there was no cause of action within the period of limitations, and the discovery rule cannot create one when none had ever existed during the period of limitations.

*Doe v. Cherwitz*, 518 N.W.2d 362, 364–65 (Iowa 1994); *see also Cramer v. Archdiocese of Cincinnati*, 814 N.E.2d 97, 103 (Ohio Ct. App. 2004) ("As the trial court correctly held, a claim for loss of consortium arises out of marriage and does not extend to unmarried individuals."), *abrogated on other grounds by* Doe v. Archdiocese of Cincinnati, 849 N.E.2d 268 (Ohio 2006).

Here, as Judge Goodstein observed, "the husbands or wives of the consortium claimants were sexually abused as children, hence, before they married the claimant. As a result, the claimant married his or her spouse in the condition in which they assert as a loss of [] consortium." (Dkt. No. 71-2 at 11); *cf. Sartori v. Gradison Auto Bus Co.*, 42 Pa. D. & C.2d 781, 785 (Pa. Com. Pl. 1967) ("A subsequent [to the injury] husband should not acquire any right to sue for loss of consortium. He should not be entitled to marry a cause of action. The tortfeasor, we are frequently told, takes his victim as he finds him."). The Diocese thus was not "legally obligated to pay" spousal consortium claims, and Century has no duty to indemnify the Diocese for consortium claims. The Court therefore grants Century's motion for summary judgment as to consortium claims.

### B. Motion for Partial Summary Judgment as to All Class Action and Certain Individual Claims

The undisputed terms of the applicable insurance policies required the Diocese, as a condition of coverage, to "immediately forward to the [insurer] every demand, notice, summons, or other process received" regarding any claim; to give written notice to the insurer of any "injury

or occurrence . . . as soon as practicable"; and to cooperate with the insurer "in the conduct of suits." (Dkt. No. 72-1 at 11–12.) Those terms also provided that the Diocese "shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative." (*Id.*) Century argues that it is entitled to summary judgment as to the class action settlement and certain other individual claims because the Diocese breached those terms by failing to provide prompt notice of claims to Century and by voluntarily assuming obligations and making payments on claims without Century's consent. (*Id.* at 13 (citing *Hodges v. State Farm Mut. Auto. Ins. Co.*, 488 F. Supp. 1057, 1061 (D.S.C. 1980) ("In South Carolina, the failure of the insured to comply with the obligations of the contract will release the insurer from liability.")).)

The Diocese responds with several arguments. For one, it argues that its duty to obtain consent does not apply "when there is a conflict of interest between the insured and the insurer because the insurer's strategy exposes the insured to an excess judgment." (Dkt. No. 84 at 12.) The Diocese claims that Century's "insistence the Diocese defend the abuse cases (on the basis of the statute of limitations and charitable immunity) exposed the Diocese to significant excess judgments." (*Id.*) That is unpersuasive. There is no evidence that a decision that the abuse cases should be fought on statute of limitations and charitable immunity grounds constituted bad faith. When approving the class action settlement, Judge Goodstein noted that the settled claims "might already be barred by significant legal defenses, including the statute of limitations and charitable immunity" and that "[c]lass counsel has been able to succeed in this case where other lawyers, in identical cases, have failed . . . ." (Dkt. No. 71-2 at 14.)

Moreover, the Diocese agreed to cooperate with Century "in the conduct of suits." (*E.g.*, Dkt. No. 70-2 at 9.) That agreement is meaningless if it is bad faith dealing for the insurer to make

-10-

any decision (regarding its own money) contrary to the insured's preferences. The law does not require insurers to accept *any* within-policy-limits settlement offer, without regard to the legal strength of the claim. The Court therefore finds no suggestion of bad faith in the April 27, 1999 letter that the Diocese quotes with opprobrium: "Given these two strong defenses for the periods during which [Century's predecessor] provided coverage we consider a settlement of $162,500.00 to be entirely unreasonable from a legal perspective. Clearly, the Diocese effected this Settlement for its own reasons—primarily to avoid negative publicity—without regard to the legal merits of the claim." (Dkt. No. 84 at 7 (quoting Letter from Cody W. Smith to James C. Geoly, Apr. 27, 1999).) This is not to say that the Court has determined that the charitable immunity or statute of limitations defenses *would have* succeeded—the Court recognizes that some victims alleged intentional, reckless, or grossly negligent conduct not subject to charitable immunity and delayed discovery of injuries due to repressed memories. (*See* Letter of James C. Geoly to Cody W. Smith, Apr. 8, 1998, Dkt. No. 84-14 at 25 (analysis of legal defenses).) Indeed, the Diocese's 1998 analysis regarding the applicability of the discovery rule to repressed memories proved correct. *Moriarty v. Garden Sanctuary Church of God*, 534 S.E.2d 672, 679 (S.C. 2000), *modified by South Carolina v. Cherry*, S.E.2d 475 (S.C. 2004) ("Accordingly, we affirm the Court of Appeals and hold that a plaintiff may assert the discovery rule contained in S.C. Code Ann. § 15-3-535 in a case involving repressed memories of sexual abuse."). The Court finds that a decision to defend decades-old claims against a church on statute of limitations and charitable immunity grounds is not evidence of bad faith.

The Diocese's other arguments against summary judgment, however, are stronger. The Diocese argues that an insurer's prior consent regarding settlement is unnecessary where the insurer denies the existence of the applicable policy. (Dkt. No. 84 at 12.) The Court finds that

-11-

persuasive with regard to claims of sexual abuse involving the period May 6, 1962 to May 6, 1965. Century has consistently denied the existence of a policy covering sexual abuse claims for that period. (*See* Answer ¶ 5, Dkt. No. 4 at 1–2.) If the existence of such a policy is proven after claims are settled, Century cannot then object to indemnifying those settled claims by arguing that the insured failed to provide notice under that policy at the very time when the insurer was denying its existence. *Cf. Episcopal Church v. Church Ins. Co.*, 53 F. Supp. 3d 816 (D.S.C. 2014) (predicting that South Carolina follows the general rule that an insurer that refuses to defend a claim has no right to control the litigation or settlement of that claim).

The Diocese raises a genuine factual issue as to whether Century agreed that the Diocese could settle claims without Century's prior consent. (*See, e.g.*, Dkt. No. 71-14 (December 19, 1997 letter from James C. Geoly to Cody W. Smith stating that "Rather, he [William Britt, employed by CIGNA, a predecessor-in-interest of Century] agreed that the Diocese would not waive its coverage solely on the ground that it had settled the matter without CIGNA's prior consent"); Dkt. No. 71-15 at 1 (March 6, 1998 letter from James C. Geoly to Cody W. Smith stating "I do want to confirm that CIGNA has agreed that the Diocese's decision to settle these claims would not prejudice the Diocese' position with respect to coverage . . ."); Dkt. No. 71-16 at 1 (February 20, 2000 letter from James C. Geoly to Edward Rynex stating "When we spoke before settlement meetings in the fall, and you agreed that the Diocese of Charles would not waive any claim for reimbursement it may have by settling this matter"). Whether such an agreement existed and, if it did, which settlements it applied to, are factual disputes for trial.

The Diocese also raises genuine factual disputes as to whether Century acted in bad faith by denying the coverage and by denying any obligation to defend before a lawsuit was actually filed. For example, on or about April 15, 1998, internal notes titled "committee disposition

strategy" state, "Argue to insured there is no coverage for these claims." (Dkt. No. 84-3 at 2.) Earlier internal notes, dated March 9, 1994, state, "our position is that occurrence is when clt [client] becomes aware of problem" and that "current policies exclude sexual abuse"—which may indicate a bad faith attempt to read terms applicable to later policies into the policies in force when the covered abuse occurred. (Dkt. No 84-7.); *cf. Soc'y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1362 (5th Cir. 1994) ("Under [an occurrence-based] policy, it is the date of the occurrence, and not the date of the claim, that determines coverage.").

Finally, and most importantly, in South Carolina "an insurer, seeking to relieve itself of liability because of the violation by the insured of a cooperation clause in the policy, has the burden of showing not only that the insured failed to cooperate within the meaning of the policy provision but that it was substantially prejudiced thereby. Such issue is generally one of fact for the jury . . . ." *Vaught v. Nationwide Mut. Ins. Co.*, 156 S.E.2d 627, 630 (S.C. 1967). The Diocese contends that "the ultimate settlement results achieved by Plaintiffs were highly favorable and well within the bounds of reasonableness by any measure." (Dkt. No. 84 at 20.) If that contention is true, Century cannot refuse to indemnify the Diocese simply because of a violation of policy provisions requiring notice or consent. Whether that contention is true is a factual issue for trial.

The Court therefore denies Century's motion for summary judgment as to the class action settlement and certain individual claims.

### C.   Motion for Partial Summary Judgment as to Pre-May 6, 1965 Claims

#### 1.   Pre-May 6, 1962 claims

Century argues that it is entitled to summary judgment regarding pre-May 6, 1962 claims because the Diocese does not allege that any policy covered any period before May 6, 1962. The Diocese responds that coverage exists for those claims under later policies because "South

-13-

Carolina applies a modified continuous trigger standard." (Dkt. No. 84 at 24.) The Court concludes that South Carolina's "modified continuous trigger standard" does not result in coverage for claims arising from abuse that ceased before any coverage commenced, and, consequently, the Court finds that Century has no liability for sexual abuse claims where the last instance of sexual abuse occurred before May 6, 1962.[6]

Under an occurrence-based policy, the date of the occurrence, and not the date of the claim, determines coverage. The word "occurrence," however, is ambiguous where damages result from an exposure over time rather than a single discrete event. For such situations, common in toxic tort litigation, the "continuous trigger" theory provides that the date of the occurrence is the continuous period from exposure to manifestation of damage. *See* Note, *Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1579, 1581 (1986) (defining and discussing the "continuous trigger" theory). South Carolina has adopted a modified version of the continuous trigger theory, modified to start when damage first occurs, rather than at the time of the injury-causing event. *Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co.*, 486 S.E.2d 89, 90 (S.C. 1997) (holding that a modified continuous trigger theory applies where defective workmanship causes "progressive damage that is not apparent at the time of the underlying injury-causing event"). But the Diocese cites no authority for the proposition that insurance policies covering the period 1965 to 1979 (or allegedly, 1962 to 1979) cover a claim, asserted in 2007, of sexual abuse occurring in the 1940s. (*E.g.*, Am. Compl. Ex. 1, Dkt. No. 1-1 at 20 (Jane Doe 408 claim in 2007 regarding abuse occurring 1943 to 1946).)

---

[6] The act within the scope of coverage is the Diocese's own recklessness or negligence in allowing the abuse and not the intentional act of the abuser himself, *see Mfrs. & Merchs. Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222, 228 (S.C. Ct. App. 1998), but that distinction does not appear relevant to the dates of coverage issues *sub judice*.

To the contrary, "[t]he practical effect of applying the continuous trigger standard to sexual abuse cases is that each insurance policy in effect during the period of abuse affords coverage up to its limits for all of the plaintiff's damages." Barron L. Weinstein, *Sexual Misconduct Claims: A Policyholder's Perspective of Key Coverage Issues*, Brief, Winter 2009, at 48, 53; *see also Soc'y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc.*, 26 F.3d at 1365–66 (achieving same result in applying continuous trigger theory to sexual abuse). In other words, coverage is not limited to the policy in effect when the sexual abuse began. Where abuse was ongoing over a number of years, the policyholder can access successive years of coverage. This does not mean that the policyholder can access coverage for periods beginning after the last act of abuse, even though sexual abuse undoubtedly causes lifelong harm. The Diocese's position, apparently, is that any policy purchased at any time after an act of sexual abuse provides full coverage for the life of the victim. Were that the law, insurers would need to charge premiums for each period sufficient to cover decades of potential liability. *Cf. Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F. Supp. 822, 834 (D.N.M. 1994) (noting, in a sexual abuse insurance coverage case, that "an insured cannot reasonably expect a policy to cover injury originating years before the policy's inception. Insurance premiums undoubtedly do not reflect such risks and the Court can only speculate as to the enormous increase in premiums were such pre-policy injury causing events to be covered") *amended on reconsideration in part*, 866 F. Supp. 1560 (D.N.M. 1994). The Diocese cites no case standing for such a extraordinary proposition.

The Court therefore grants summary judgment for Century as to claims involving sexual abuse occurring entirely before May 6, 1962.

2.     May 6, 1962 to May 6, 1965 Claims

The parties dispute whether Century issued the Diocese a policy covering sexual abuse claims for the period May 6, 1962 to May 6, 1965. The policy itself cannot be found. The parties

-15-

agree that the Diocese may prove the existence of the policy by secondary evidence, but they dispute whether the Diocese has provided secondary evidence sufficient to establish the existence of a policy applicable to the settled claims. (*See* Dkt. No. 84-1 at 22 (May 30, 1996 letter from Wade H. Logan, III to James C. Geoly stating, "The issue is not whether or not the Diocese may rely upon appropriate secondary evidence to attempt to establish coverage; in our view, it may. The issue will be whether any appropriate source will be sufficient to establish coverage for these claims . . . .").) The Court finds the Diocese's evidence regarding the existence of a policy covering the period May 6, 1962 to May 6, 1965 sufficient to create a triable factual dispute, though this should not be taken as a comment on the strength of that evidence. (*See, e.g.*, Dkt. No. 84-1 at 27–18 (January 24, 1996 letter from James C. Geoly to James M. Crowley itemizing the Diocese's evidence).) The strength of the Diocese's evidence is an issue for trial. The Court therefore denies the motion for summary judgment as to claims involving sexual abuse occurring at least in part during the period May 6, 1962 to May 6, 1965.

### D.     Motion to Exclude the Testimony of William Hager

Century also moves, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the testimony of William Hager. Century argues that his opinions are inaccurate legal opinions, that he adds no specialized knowledge, and that he would opine on the ultimate issue in this case. (Dkt. No. 74 at 1.)

Rule 702 provides,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court interpreted Rule 702 as placing the court in a "gatekeeping role" between expert evidence and the trier of fact. 509 U.S. at 589, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that *Daubert* applies to all forms of expert evidence). However, "[t]he gatekeeping function of the court is relaxed where a bench trial is to be conducted, as in this case, because the court is better equipped than a jury to weigh the probative value of expert evidence." *Traxys N. Am., LLC v. Concept Mining, Inc.*, 808 F. Supp. 2d 851, 853 (W.D. Va. 2011). "The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial," *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004), because "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself," *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

The Court finds the objections Century raises to Mr. Hager's expected testimony irrelevant to a bench trial.[7] Century can challenge the relevance and reliability of his opinions at trial. "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). In this case, there will be no jury to sway. Century's motion to exclude his testimony is denied.

### E.   Order to Provide Tabulated Data

The Court observes that the tabulations of claims data in this matter are not entirely clear or consistent. *See, e.g.*, note 3, *supra*. To avoid confusion at trial, the Court orders the parties to file jointly a single table that details the sexual abuse claims at issue, no later than October 17,

---

[7] Century filed its motion to exclude Mr. Hager before the parties agreed to a bench trial; its supporting memorandum refers to a "jury" forty-three times.

2016. The table shall contain all columns contained in Exhibit A to the Diocese's response to Century's first set of interrogatories. The parties shall stipulate to the accuracy of undisputed tabulated information. Where there is a dispute regarding tabulated information, the disagreement shall be noted on the table. Any discrepancies from the information presented in Exhibit 1 to the amended complaint shall be annotated. An Excel-format electronic copy of the table shall be provided to chambers. The table shall be filed no later than October 17, 2016. To the extent possible, the parties' pretrial briefs and proposed findings of fact shall cite to the jointly filed table.

## IV. Conclusion

For the foregoing reasons, the Court the Court **GRANTS** the motion for partial summary judgment as to loss of consortium (Dkt. No. 69), **DENIES** the motion for partial summary judgment as to all class action and certain individual claims (Dkt. No. 72), **GRANTS IN PART AND DENIES IN PART** the motion for partial summary judgment as to pre-May 6, 1965 claims (Dkt. No. 73), **DENIES** the motion to exclude the testimony of William Hager, and **ORDERS** the parties jointly to file tabulated claims data in accordance with Part III.E of this Order no later than October 17, 2016.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

August 3 1, 2016
Charleston, South Carolina